United States District Court
For the Northern District of California

1

2

3                              IN THE UNITED STATES DISTRICT COURT

4                          FOR THE NORTHERN DISTRICT OF CALIFORNIA

5

6    PETROLEUM SALES, INC.,                           No. C 05-3526 SBA

7                 Plaintiff,                          **ORDER**

8        v.

9    VALERO REFINING COMPANY –
     CALIFORNIA; VALERO MARKETING AND
10   SUPPLY COMPANY; and DOES 1 through 20,

11               Defendants.
     _____/
12

13       This matter comes before the Court on Defendants' Motion for Summary Judgment [Docket

14   No. 56].  Having read and considered the arguments presented by the parties in their moving papers,

15   the Court finds this matter appropriate for disposition without a hearing.

16                                     **BACKGROUND**

17       This case arises out of a dispute between Defendant Valero,[1] which operates a network of gas

18   service stations in the United States, and Plaintiff Petroleum Sales, Inc. ("PSI"), which owns and

19   operates four Valero-branded service stations in the Bay Area, regarding the system used by PSI to

20   process credit card transactions.

21       PSI was formed by Ben Shimek in 1980, and the corporation is wholly owned by Shimek and

22   his wife.  Phelps Decl. Ex. J (Shimek Depo. at 19, 57).  Shimek has been in the service station

23   business for 36 years.  *Id*. at 12.  PSI has approximately 250 employees, and its total revenue in 2005

24   was approximately $10 million.  Phelps Decl. Ex. L (Paul Depo. at 22-23).

25       The four service stations at issue were formerly Exxon stations.  Skellie Decl. at ¶ 2.  Exxon

26

27       [1]Defendants in this action are Valero Refining Company – California; Valero Marketing and
     Supply Company; and Does 1 through 20.  Except where necessary, they will be referred to collectively
28   as "Valero" or "Defendants."

United States District Court

For the Northern District of California

1    sold its gas stations in the Bay Area to Valero Energy Corp. in 2000, and Shimek signed franchise

2    agreements with Valero Refining on behalf of PSI on June 14, 2000.  Shimek Decl. at ¶¶ 10-11.  In

3    July 2000, Valero offered Shimek the option to purchase the service stations.  Plaintiff's Ex. 7.  The

4    letter stated "[t]his offer must be accepted as and when described above.  Returning changed or

5    altered Purchase Agreements will be deemed a rejection even if returned by the deadline and

6    signed."  *Id.*  In May 2001, PSI purchased the land and improvements at the service station sites.

7    Skellie Decl. at ¶ 2.  Shimek signed standard form dealer agreements with Valero.  Shimek Decl. at

8    ¶ 18.

9         The dealer agreements consist of two parts, the Contract Dealer Account Supply Agreement

10   (the "Supply Agreement") and the Contract Dealer Account Identifications and Equipment

11   Agreement (the "Equipment Agreement").  *See* Phelps Decl. Ex. R.  These agreements were

12   originally entered into between Valero Refining Company and PSI.  In May 2002, Valero Refining

13   Company assigned all of its rights and obligations under the agreements to Valero Marketing and

14   Supply Company.  Skellie Decl. at ¶ 3.

15        The Equipment Agreement provides that "DEALER agrees to be bound by and comply with

16   all terms and conditions of any card guide or agreement under which VALERO or THIRD PARTY

17   ISSUER agrees to process and pay for Valero Cards and other card sales tickets.  The terms of such

18   card guide or agreement may be amended and/or supplemented at any time by VALERO or THIRD

19   PARTY ISSUER(S)."  *Id.* at PSI0000077.  In other words, the terms of the Credit Card Sales Guide

20   are incorporated by reference into the dealer agreement.

21        Blair Skellie, Valero's West Coast Region Director, declares that Valero requires its branded

22   retailers to accept a "slate" of credit cards, which is set forth in the Credit Card Sales Guide.  Skellie

23   Decl. at ¶ 6.  Valero retailers are charged a fee for each transaction using a non-proprietary credit

24   card.  *Id.* at ¶ 7.  "Since September 2003, Valero dealers have not been charged a fee for processing

25   transactions using the Valero proprietary credit card."  *Id.*

26

27

28                                                    2

The Credit Card Sales Guide[2] states, under the heading "What Cards You Can Accept," that transactions at all Valero stations "must be processed through the Valero Credit Card Processing Network, which operates on a computer switching system and communication network ("Network") which is currently offered by EFS Concord/BuyPass ("BuyPass") as our approved third party system provider."  Phelps Decl. Ex. N.  According to Skellie, "[V]alero Marketing's goal is to provide a consistent retail offering to consumers . . . [a]llowing retailers to make their own separate deals with credit card processors threatens Valero Marketing's ability to offer that consistent retail experience."  Skellie Decl. at ¶ 9.

The Supply Agreement provides that Valero may, "at its sole option" pay the dealer a Facilities Allowance to assist with maintenance, repair and replacement obligations.  Phelps Decl. Ex. R at PSI0000042.  The Facilities Allowance was set at three cents per gallon on gas purchased from Valero.  Valero reserved the right, "in its sole discretion, to periodically change, reduce or eliminate, the FACILITIES ALLOWANCE, or to revise the timing, schedule or method of paying the FACILITIES ALLOWANCE."  Further, "VALERO will cease payment of the FACILITIES ALLOWANCE if VALERO decides, in its sole discretion, that TENANT is not fulfilling all of its responsibilities under the SUPPLY AGREEMENT . . . or under any EQUIPMENT AGREEMENT."  *Id.*

The Supply Agreement also contains a waiver of any claim for consequential damages.  Section 18.7 states: "Neither party will make any claim relating to this SUPPLY AGREEMENT for special or consequential damages except that VALERO may make any claim relating to this SUPPLY AGREEMENT for consequential damages to the extent covered by DEALER'S insurance."  Phelps Decl. Ex. R at PSI0000055.

Shimek testified that he signed the agreements with Valero without reading them.  Phelps Decl. Ex. J (Shimek Depo. at 86).  He also testified that his then-attorney, Mr. Daskal, represented

---

[2]The version of the Credit Card Sales Guide discussed herein is dated June 1, 2003.  *See* Phelps Decl. Ex. N.  As will be discussed, there is some dispute with regard to when revisions were made to the Guide, and when PSI was notified of such revisions.

3

that the supply agreement was offered on a "take it or leave it" basis. Shimek relied on that representation and signed the agreement. *Id*. Shimek states that "Valero Refining instructed PSI that the terms of those agreements were not negotiable. No Card Guide was attached to any of those agreements. I was not aware that these agreements contained waivers of consequential or special damages when I signed them. Neither Valero Energy nor defendants brought those waivers to my attention." Shimek Decl. at ¶ 18.

Further, Shimek states that the agreements were "more unfairly one-sided than other dealer contracts in the petroleum industry in the Bay Area. . . . I am aware of no other agreement that gave a supplier discretion to charge an individual dealer more for petroleum products simply because the supplier claimed that a dealer had committed a breach of a dealer agreement. I am aware of no other agreement that contained a waiver of consequential and special damages . . . I have been familiar with the terms of dealer contracts with major oil refiners and independent distributors in the Bay Area because I have routinely reviewed and signed them since about 1980." Shimek Decl. at ¶ 20. However, Shimek states that he decided to sign the agreements because his only other alternative was to remain a franchisee and pay three cents more per gallon, "since only dealers who purchased their stations would receive Facilities Allowances." *Id*. at ¶ 18. "I decided to purchase the stations, in part, because Valero Refining represented that it would lower gasoline prices and would not lower PSI's Facilities Allowances (3 cpg) without 'careful consideration.'" *Id*. at ¶ 17.

Shimek states that between October 2000 and July 2003, he had several discussions with Valero employees Roberto Barrantes and Blair Skellie regarding his concern that the Valero credit card network authorized cards too slowly. Shimek Decl. at ¶ 16. "On many occasions, I asked them to upgrade or to allow PSI to upgrade the system to satellite or high-speed communications systems. . . . Defendants did not respond to my requests and concerns. Instead, defendants insisted (for no stated reason) that all dealers must use the Valero dialup system." *Id*. Shimek asked Michael Trimble, a consultant for retail gas stations, to determine whether the speed of credit card authorization at PSI's Valero-branded stations could be improved. Trimble Decl. at ¶ 6. Trimble

4

United States District Court

For the Northern District of California

1   timed credit card authorizations and observed that they ranged between 15 and 30 seconds.  He also

2   observed that customers became frustrated by the delay.  *Id*.  In addition to the speed of transactions,

3   PSI was concerned about delays in settlement with Valero's system (i.e. that the dealer would not get

4   paid in a timely manner), and about high credit card fees.  Phelps Decl. Ex. K (Trimble Depo. at 81).

5   Trimble determined that the cause of the problems was Valero's authorization procedures and

6   telephone communication network, and advised Shimek that "the most reliable, efficient, and cost

7   effective way to improve credit card authorization times" was to change from telephone to satellite

8   communications.  Trimble Decl. at ¶¶ 7-8.  Trimble discussed this option with a representative of

9   Valero, who stated that "satellite communications was not something that was offered by Valero at

10  that time.  He stated that Valero was considering several options for the credit card network. . . .  No

11  one at Valero responded to my recommendation."  *Id*. at ¶ 8.

12          Barrantes, Valero's Branded Sales Manager, testified in his deposition that he had several

13  conversations with Shimek in which Shimek threatened to stop using the Valero system.  Phelps

14  Decl. Ex. G. at 52-54.  In 2003, after Valero began issuing proprietary credit cards, Shimek asked

15  Trimble to determine whether it was feasible for PSI to continue to process Valero cards if PSI used

16  satellite communications.  Trimble Decl. at ¶ 11.  Trimble gave Shimek various options, each of

17  which required Valero's approval.  *Id*.

18          In early July 2003, Shimek asked Barrantes to identify all writings that would preclude PSI

19  from using another credit card processing network, and Barrantes faxed PSI Section 5.2 of the

20  Equipment Agreement, which required PSI to follow the Card Guide.  Shimek Decl. at ¶ 22.  On

21  July 18, 2003, Shimek signed agreements with Petroleum Card Services, Inc. to have Valero's

22  processor (EFS Concord BuyPass) process PSI's credit card transactions for lower fees.  *Id*. at ¶ 23.

23          On July 23, 2003, Skellie sent a letter to all Bay Area Valero dealers, stating that Valero was

24  in the process of reviewing its credit card requirements and that dealers could expect to see major

25  changes to the Credit Card Sales Guide.  Phelps Decl. Ex. P.  However, the letter stated that "Valero

26  is aware of certain discussion being held among its branded dealers related to the removal of

27

28                                                          5

United States District Court

For the Northern District of California

Valero's credit card processing system. . .  As a Valero branded supplier, you agreed to use and promote Valero's Marks, and therefore any removal of Valero's credit card processing system, which may result in a station's inability to fully accept Valero's proprietary credit card, will be considered a violation of our agreements." *Id*.

On August 15, 2003, Valero sent a letter to its distributors, announcing, among other things, a new pricing policy and satellite service.  Phelps Decl. Ex. M.  The letter concluded by stating that: "All of these changes are outlined in the Valero Credit Card Sales Guide.  Changes have been made to pages 1-1, 3-3, 4-4, 9-2, 9-5, 9-6, and 10-2.  You can obtain a copy of these pages by logging onto https://wp.valero.com under the Guides tab. . . . Please make sure these pages (revision date September 3, 2003) are inserted in place of the previous pages in all copies (including dealer copies) of your Credit Card Sales Guide." *Id*.  Shimek testified that he did not recall receiving the letter. Phelps Decl. Ex. J (Shimek Depo. at 164).  However, he admitted that it was in PSI's files.  *Id*.

PSI claims that Valero Marketing revised the Card Guide on September 3, 2003, but did not provide it with a written copy of this revision until November 18, 2003.  Phelps Decl. Ex. X (Plaintiff's Response to Interrogatories at 13).  Thus, PSI claims that its decision to start using its own processor "did not violate the only Card Guide that Valero had provided to PSI." *Id*. at 14. Defendants point out that PSI was advised of the changes to the Guide in the August 15, 2003 letter, which Shimek concedes was possessed by PSI.

On August 27, 2003, Shimek signed agreements to connect PSI's credit card processing equipment to satellite communications.  Shimek Decl. at ¶ 23.  PSI's stations were connected to satellite communications in or around October 2003.  *Id*.

In late September 2003, as part of Valero's move to satellite communications, Barrantes sent out satellite service agreements to dealers and distributors, and was sent out to introduce the satellite system and equipment to retailers.  Phelps Decl. Ex. G at 86-87.  Around that time, Barrantes had conversations with Shimek in which Shimek said that the contract requiring PSI to use Valero's credit card processor was "a crock of shit.  And there is nothing in the contract that will hold any

1  water because when we signed the supply contract, Valero did not have a credit card."  Phelps Decl.

2  Ex. J (Shimek Depo. at 184).  Shimek also told Barrantes that he had declared war against Valero,

3  and that even if Valero's satellite program was similar, he would use his own.  *Id.* at 185.

4       On November 4, 2003, Richard Murray, an attorney who was then representing PSI, sent

5  Valero a letter stating that PSI was converting its credit card processing to a third-party processor.

6  Phelps Decl. Ex. T.  *See also* Phelps Decl. Ex. J (Shimek Depo. at 187-88).  The letter further stated:

7  "As PSI has already told Valero, PSI has confirmed with its processor that it can accept the Valero

8  proprietary credit card for processing provided that Valero provides consent to do so. . . . To avoid

9  any interruption in PSI's ability to accept Valero card charges we ask that you provide in writing the

10 necessary consent to processing of Valero proprietary card charges at your earliest opportunity."  *Id.*

11      On November 13, 2003, Skellie sent a letter to Shimek regarding his "failure to comply with

12 Valero Credit Card Sales Guide."  Phelps Decl. Ex. O.  The letter stated that Shimek's unilateral

13 decision to cease using Valero's approved credit card processor was in contravention of their

14 agreements.  Further, Valero declined to give consent for PSI's third-party processor to accept the

15 Valero card: "[a]lthough you may believe this is a viable option, we believe that we should not have

16 to change our entire way of doing business at over 1500 locations throughout the United States so

17 that four of your stations can accept Valero's proprietary cards.  In addition, we have been informed

18 by our processor that the costs to take on such a task are immeasurable both in time and money for

19 both of us."  *Id.*  Finally, Skellie stated, "we would like to provide you with an opportunity to resolve

20 this matter by resuming compliance with the Sales Guide within fifteen (15) days of the date of this

21 letter.  In the meantime, as of November 13, 2003, Valero has suspended payment of Facility

22 Allowances related to the Stations.  If, during the next 15 days it is your decision to resume

23 compliance with the Sales Guide, we will end the suspension of such funds and reimburse such

24 suspended amounts.  If you fail to come into full compliance with the Sales Guide, we will end all

25 Facility Allowance payments until such time you come into compliance.  The choice to receive

26 Facility Allowance payments is at your discretion."  *Id.*

27

28

United States District Court

For the Northern District of California

Shimek testified that he made a conscious decision not to follow the directions in the above letter. Phelps Decl. Ex. J (Shimek Depo. at 195). He stated: "it wasn't clear to me that they could do this." Q: "As a matter of the contract?" A: "Plus I had already contracted with other people to do the processing that was a benefit to me. Valero's attempts were too little, too late." *Id*. Shimek acknowledged that he understood in November 2003 that it was his decision whether to receive Facilities Allowances based on doing what was asked in Valero's letter. *Id*. at 199.

Because PSI was not using Valero's credit card processing system, and Valero did not give consent for PSI to have its own processor process transactions with Valero credit cards, customers at PSI's stations were unable to use Valero cards. Valero started to receive complaints from customers about their inability to use Valero cards at those stations, and Valero sent Shimek written information about such complaints. *Id*. at 199. Trimble admitted that the problem of significant delays in authorization of transactions was resolved in 2002, and that the problem of delays in settlement was also resolved before PSI stopped using the Valero card system. Phelps Decl. Ex. K (Trimble Depo. at 87-88).

PSI went back on the Valero system in December 2004, at which point Valero resumed payment of Facilities Allowances. Phelps Decl. Ex. J (Shimek Depo. at 198). Valero did not pay the three-cent per gallon Facilities Allowance to PSI from November 13, 2003 to December 21, 2004, which the parties refer to as the "damage period."

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a court may properly grant a motion for summary judgment if the pleadings and materials demonstrate that there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment may be granted in favor of a defendant on an ultimate issue of fact where the defendant carries its burden of "pointing out to the district

court that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325; *see Johnston v. IVAC Corp.*, 885 F.2d 1574, 1577 (Fed. Cir. 1989).

To withstand a motion for summary judgment, the non-movant must show that there are genuine factual issues which can only be resolved by the trier of fact. *Anderson*, 477 U.S. at 250. The nonmoving party may not rely on the pleadings but must present specific facts creating a genuine issue of material fact. *T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The court's function, however, is not to make credibility determinations. *Anderson*, 477 U.S. at 249. The inferences to be drawn from the facts must be viewed in a light most favorable to the party opposing the motion. *T.W. Elec. Serv.*, 809 F.2d at 631.

## ANALYSIS

I.    **Defendants' Objections to Plaintiff's Evidence**[3]

A.    <u>Objections to Shimek Declaration</u>

i.  Exhibits 2, 3, 5, 7, 11, 21, and 37

These exhibits are: (2) a letter from Exxon to PSI dated December 6, 1999; (3) al letter from Bill Greehey, Chairman of the Board and CEO of Valero Energy Corp., to Shimek dated April 3, 2000; (5) a letter from Gregory Kaneb, Vice President of Valero Refining Company – California, to "prospective dealer," dated June 1, 2000; (7) a letter from Kaneb to "dealer" dated July 28, 2000; (11) unidentified correspondence, apparently from Valero to retailers; (21) a letter from Shimek to Belinda Hacker, Valero Credit Manager, dated May 25, 2000; and (37) a letter from Blair Skellie, Director, West Coast Region of Valero Refining Company – California, to Shimek, dated April 22, 2002.

Defendants object that these letters are not properly authenticated. *See Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002) ("We have repeatedly held that unauthenticated documents cannot be considered in a motion for summary judgment."). Federal Rule of Evidence

---

[3]The facts section above does not include evidence as to which this Court has sustained Defendants' objection.

United States District Court

For the Northern District of California

901 provides that evidence may be authenticated in a number of ways, including the testimony of a witness with knowledge. Shimek does not state that he has personal knowledge of the letters, nor does he swear that they are true and correct copies. Thus, the objection is SUSTAINED.

ii. Exhibits 4, 6, and 10

Defendants object that these letters are not properly authenticated. Exhibit 4 is a letter from counsel for Valero in response to public comment submitted by PSI's attorney, Mr. Daskal. Shimek declares that he received the letter from PSI's attorney, but he does not swear that it is a true and correct copy. *See* Shimek Decl. at ¶ 3. Exhibit 6 is a letter from counsel for Valero in response to complaints raised by Dennis DeCota of the California Service Station and Automotive Repair Association. Shimek declares that he received the letter from Mr. DeCota, but he does not swear that it is a true and correct copy. *See* Shimek Decl. at ¶ 4. Exhibit 10 is a letter from counsel for Valero to PSI's attorney Daskal, which Shimek declares that he received from Daskal "and/or Mr. DeCota." *Id.* at ¶ 5. Again, Shimek does not swear that the exhibit is a true and correct copy of the letter. Thus, Defendants' objection is SUSTAINED.

iii. Exhibit 25

Shimek declares that Exhibit 25 is copies of credit memos faxed by Valero Marketing in San Antonio, Texas to PSI on December 15, 2003. Shimek Decl. at ¶ 7. Defendant correctly points out that Shimek fails to testify as to their accuracy or genuineness based on personal knowledge or otherwise. Thus, the objection is SUSTAINED.

iv. Shimek Decl. ¶¶ 12, 21

Paragraph 12 states: "Shortly after PSI became a Valero Refining franchisee, I discovered that the electronic credit card processing system installed by Valero Refining at PSI's stations authorized credit cards too slowly. Valero Refining's system took 15 to 30 seconds to authorize a credit card, while systems used by most major brands, including Exxon, took 3-6 seconds. The delay was a serious competitive disadvantage for PSI because its customers were frustrated and left PSI's stations." Paragraph 21 states: "By early 2003, VMSC [Valero Marketing and Supply Co.]

10

converted PSI's stations to a network provided by EFS Concord BuyPass. PSI did not sign any confidentiality agreement with respect to credit card authorization data downloaded by VMSC onto PSI's point-of-sale equipment. VMSC's new dialup network was still unreasonably slow. It took about 12-15 seconds to authorize cards. PSI's customers were still frustrated because their cards were authorized more slowly that at most other stations."

Defendants object to these statements because Shimek fails to establish that he had personal knowledge of the information. See Fed. R. Evid. 602 (providing that a witness may not testify to a matter unless evidence is introduced to support a finding that the witness has personal knowledge of the matter). As the sole owner of PSI, the information seems to be of a type that Shimek would know, but Shimek does not explicitly state the basis for his personal knowledge of the information. Thus, the objection is SUSTAINED.

> v.  Shimek Decl. ¶ 22, lines 5-7

This is a statement by Shimek that "Mr. Trimble reported to me that the Card Guide did not prohibit PSI from processing third party cards (e.g. Visa and Mastercard) on a separate network." Defendants object on hearsay grounds. This objection is SUSTAINED – Shimek offers the statement of a third party, Trimble, for its truth.

> vi.  Shimek Decl. ¶ 25, lines 2-3

This is a statement by Shimek that "Mr. Trimble had advised me that the only requirement was for VMSC to authorize PSI to download its authorization information to PSI's 'gateway.'" Defendants object on hearsay grounds. This objection is SUSTAINED – Shimek offers the statement of a third party, Trimble, for its truth.

> vii.  Shimek Decl. ¶ 27, lines 13-16

This is a statement by Shimek that "I am informed by PSI's accountant (Ms. Paul) and believe that PSI's business records show that those payments would have totaled $338,619.54." Defendants object on hearsay grounds. This objection is SUSTAINED – Shimek offers the statement of a third party, Paul, for its truth.

11

1          viii.  Shimek Decl. ¶ 29

2          Paragraph 29 states: "In May 2000, Valero Refining required PSI to complete a standard

3   form which authorized Valero Refining to initiate electronic fund transfers (1) from PSI's bank in

4   San Francisco to pay for petroleum products purchased by PSI and (2) to PSI's bank in San

5   Francisco to pay Facilities Allowances.  I have reviewed PSI's banking records and the declaration

6   of Ms. Hein attached as Exh 23 and discussed electronic fund transfers to and from PSI's account at

7   City National Bank in San Francisco initiated by VMSC with representatives of the bank.  During

8   the damage period, VMSC in Texas initiated Electronic Fund Transfers from PSI's bank in San

9   Francisco to Valero Energy's bank in Ohio to pay for PSI's petroleum purchases.  Since 2002,

10  VMSC in Texas has paid Facilities Allowances by initiating electronic fund transfers from Valero

11  Energy's bank in New York to PSI's bank in San Francisco.  Mr. Barrantes advised me that VMSC

12  debited and credited all Valero dealers in the same fashion."

13         Defendants object on the ground of "lack of personal knowledge concerning PSI's electronic

14  funds transfers."  Shimek states that the basis for his knowledge of the electronic funds transfers is

15  his discussions with representatives of PSI's bank.  Accordingly, this objection is SUSTAINED.

16         Defendants also object that Shimek's statement about what Mr. Barrantes told him is hearsay.

17  The Court agrees, and the objection is SUSTAINED as to lines 3-4 of the paragraph.

18          ix.  Shimek Decl. ¶¶ 30-32

19         Paragraph 30 states: "PSI's Westborough station in South San Francisco and Sullivan station

20  in Daly City competed for retail gasoline customers with Valero branded stations at 800 El Camino

21  Real in San Bruno during the damage period.  PSI's Westborough and Sullivan stations were located

22  in different price zones than the Valero stations in San Bruno."

23         Paragraph 31 states: "PSI's Northgate station in San Rafael and Lombard station in San

24  Francisco competed for retail gasoline customers with the Valero branded station at 100 Marinwood

25  in San Rafael during the damage period.  PSI's Lombard station was located in a different price zone

26  than the Valero station at 100 Marinwood."

27

28                                                          12

1    Paragraph 32 states: "From September 1, 2001, to October 10, 2003, PSI's station in

2    Kentfield was supplied under a standard form Distributor Sales Agreement ("jobber supply

3    agreement") between VMSC (as assignee of Valero Refining) and PSI.  During that time, VMSC

4    sold petroleum products to PSI as a jobber at wholesale.  I have been informed by other Valero

5    jobbers and dealers that VMSC has continued to sell petroleum products to Valero jobbers at

6    wholesale since termination of PSI's jobber agreeement."

7    Defendants object to the above on the ground that Shimek lacks personal knowledge

8    concerning whether Valero stations were in competition with each other.  Further, Defendants object

9    that these declarations conflict with Shimek's deposition testimony, and argue that Plaintiff cannot

10    create a genuine issue of material fact submitting an affidavit contradicting deposition testimony.

11    *See Radobenko v. Automated Equip. Corp.*, 520 F.2d 540, 544 (9th Cir. 1975) (so holding).  The

12    Court is persuaded that Shimek has not appropriately established the basis for his knowledge of

13    which gas stations are in competition with each other.  Thus, the objection is SUSTAINED.

14    Further, Defendants object that lines 16-22 of Paragraph 32 are irrelevant, because the PSI's

15    Kentfield Station is not at issue in this litigation.  The Court agrees; this objection is SUSTAINED.

16    Finally, Defendants object that lines 19-22 of Paragraph 32 are hearsay.  Shimek offers the

17    statements of unidentified parties for the truth of what is asserted, and the objection is SUSTAINED.

18    B.    Objections to Trimble Declaration

19    i.  Trimble Decl. ¶¶ 4,5

20    Paragraph 4 states: "From about 1995 to 1999, I was the General Manager for the four

21    stations involved in this action.  During that time, PSI leased these stations from Exxon.  The

22    electronic credit card processing systems installed by Exxon at those stations used telephone

23    communications to send data to Exxon's network.  Exxon's network authorized credit cards within

24    about 4-6 seconds after the customer swiped his card at the pump."

25    Paragraph 5 states: "Since about 1990, the average credit card authorization time (including

26    all telephone and satellite communications systems at major branded and independent stations) in

27

28                                    13

United States District Court

For the Northern District of California

1   the Bay Area has been five to ten seconds.  Since about 1990, retail gasoline credit card customers

2   generally notice a delay if their credit cards are not authorized within 5 to 10 seconds after they

3   swipe their card at the pump.  However, since about 1998, most retail gasoline credit card customers

4   in the Bay Area have become accustomed to waiting 3-4 seconds to have their credit cards

5   authorized at the pump.  This is due to the fact that by 1997, most major brand retail stations in the

6   Bay Area began using satellite or high speed communications to process credit card transactions at

7   their stations.  During that time, satellite and high speed communications began becoming available

8   for independent marketers.  The average credit card authorization wait time at the pump using

9   satellite or high speed communication is between 3-4 seconds."

10      Defendants object that Trimble lacks personal knowledge and fails to establish the basis for

11  his knowledge of the speed of credit card authorization.  This is a somewhat close question:

12  elsewhere in his declaration, Trimble states that he has worked in the gasoline industry in the Bay

13  Area since 1988, and that he has installed and supervised installation of electronic credit card

14  processing systems at retail gas stations.  *See id.* at ¶ 2.  However, the Court is inclined to agree with

15  Defendants that Trimble does not sufficiently lay a foundation for the detailed opinion set forth in

16  the paragraphs objected to.  Thus, the objection is SUSTAINED.

17          ii.  Trimble Decl. ¶ 13

18      This paragraph states: "During the first half of 2003, Mr. Shimek also asked me to review

19  Valero's Credit Card Sales Guide to determine whether the requirement of Valero's electronic credit

20  card processing system would allow PSI to process third party credit cards on a separate satellite

21  network.  During the first half of 2003, I reviewed the most current edition of the Credit Card Sales

22  Guide which Valero had provided to PSI.  I believe it consisted of pages stamped PSI 1303 to PSI

23  1348.  Based on my review of Valero's Credit Card Sales Guide, I advised Mr. Shimek that the

24  requirements of Valero's electronic credit card processing system did not preclude PSI from using

25  satellite communications or a Verifone Omni 490 to process third party credit cards and a gateway

26  to process Valero's proprietary cards on Valero's existing dialup network."

27

28                                      14

1    Defendants object that Trimble lacks the "scientific, technical or specialized knowledge to

2    draw conclusions concerning whether the Credit Card Sales Guide precluded PSI from suing its own

3    credit card processing system to process Valero and third-party credit cards," citing Federal Rule of

4    Evidence 702.  Trimble has been a consultant for retail gas stations in the Bay Area since 1999, and

5    was retained by Plaintiff as an expert witness.  Trimble Decl. at ¶ 1.  He states that he first became

6    familiar with electronic credit card processing systems at gas stations in 1989.  Id. at ¶ 2.  However,

7    Trimble is not an attorney, nor does he profess to have any particular knowledge of contract

8    interpretation, yet he offers an opinion about what the Credit Card Sales Guide allows.  Thus,

9    Defendants' objection is SUSTAINED.

10           iii.  Trimble Decl. ¶¶ 18-20

11    Paragraph 18 states: "During the time that I was the General Manager of the four stations

12    involved in this action (1996 to 1999), each station (then branded Exxon) competed with other

13    nearby Exxon stations.  For example, the station at 2296 Westborough Boulevard, South San

14    Francisco 94080 competed with Exxon stations at 800 El Camino Real, San Bruno 94066 (about 3

15    miles away) and 310 E. San Bruno Avenue, San Bruno 94066 (about 3.3 miles away).  The three

16    stations were located near dense multi-unit housing and major commute routes including SR 101 and

17    US 380 and 280.  The station manager at Westborough monitored retail prices at 800 El Camino

18    Real.  Customers at Westborough occasionally asked about price differences between Westborough

19    and 800 El Camino Real."

20    Paragraph 19 states: "PSI's Exxon station at 1690 Sullivan Avenue, Daly City 94105 also

21    competed with the Exxon stations at 800 El Camino Real, San Bruno 94066 (about 5.9 miles away)

22    and 310 E. San Bruno Avenue, San Bruno 94066 (about 6.3 miles away).  The three stations were

23    located near dense multi-unit housing and major commute routes including SR 101 and US 380 and

24    280."

25    Paragraph 20 states: "PSI's Exxon station at 930 Del Presidio Blvd., San Rafael 94903

26    competed with Exxon stations in downtown San Rafael and Larkspur (within about 5 miles) and

27

28                                                                15

1   PSI's Exxon station at 2601 Lombard Street, San Francisco, CA 94123 (about 17.6 miles away).

2   These stations were located near residential developments and a major commute route on SR 101.

3   The station manager at 930 Del Presidio Blvd. monitored prices at Exxon stations in downtown San

4   Rafael as well as other major oil company competitors."

5          Defendants object to these statements on the ground that Trimble lacks personal knowledge:

6   "Mr Trimble testifies about whether the PSI stations were in competition with other Valero stations,

7   but fails to establish the basis for his understanding."  Aside from Trimble's position as manager of

8   the gas stations at issue, and his other experience managing or supervising gas stations in the Bay

9   Area, he offers no basis for knowledge about what stations would compete directly with each other.

10   The only basis for his opinion appears to be the distance between the stations and their location

11   along commuter routes.  Thus, the objection is SUSTAINED.

12          Defendants also object on relevance grounds, arguing that "Mr. Trimble's opinion concerning

13   the scope of competition among service stations from 1996-1999 relates to a time period that is not

14   at issue in this case."  This objection is also SUSTAINED.

15          C.      Objections to Ben-Zion Declaration

16          Barry Ben Zion is an economist who was retained by Plaintiff to compare the prices Valero

17   charged PSI compared to competing Valero dealers, and whether PSI's stations competed with other

18   Valero dealers in the same geographic markets.  Ben-Zion Decl. at ¶ 2.

19          Defendants object to Ben-Zion's entire declaration as improper expert testimony, but the

20   objection does not appear to be based on Federal Rule of Evidence 702.  Instead, they argue that his

21   "conclusory statements regarding the scope of competition among service stations is insufficient to

22   raise a triable issue of material fact."  This may be true, but it is not a basis for excluding the

23   evidence altogether.  Defendants also argue that Ben-Zion's testimony is improper to the extent that

24   it purports to contradict Shimek's testimony on the same subject.  Again, Defendants may be correct

25   that Plaintiff cannot create a triable issue of fact by submitting conflicting evidence, but that is not a

26   basis for excluding Ben-Zion's declaration.  Thus, these objections are OVERRULED.

27

28                                                      16

United States District Court

For the Northern District of California

1       Defendants also object specifically to Paragraph 11 of the Ben-Zion declaration.  This

2   paragraph states: "Defendants argue that PSI Valero stations do not compete with other Valero

3   stations.  They rely on a declaration of Donald E. Spears of MPSI for their position.  It should be

4   noted that MPSI's computer model does not address the factual issue of whether PSI's station's

5   compete with other Valero stations that are on or near primary commuter routes shared by PSI

6   stations.  Moreover, there is no evidence that the hypotheses generated by MPSI's computer model

7   have been tested empirically or subjected to peer review."  According to Defendants, this statement

8   should be excluded because at his deposition, Ben-Zion stated that he had no opinion on the model

9   that MPSI uses and that he had not been asked to critique it.  Under Federal Rule of Civil Procedure

10  37(c)(1), a party that fails to disclose information or to amend a prior response to discovery is not

11  allowed to use such information as evidence.  Accordingly, the Court agrees with Defendants that

12  Paragraph 11 should be excluded; this objection is SUSTAINED.

13      D.    Objections to Durham Declaration

14      i. Exhibits 12 and 32

15      Exhibit 12 is an email from Susan Barnes, an employee of Valero, apparently to several other

16  employees of Valero, sent on June 4, 2003, with a copy of the most current version of the Credit

17  Card Sales Guide attached.  Defendants object that these emails and the attachment are not properly

18  authenticated, because Durham fails to testify as to the accuracy or genuineness of the documents

19  based on personal knowledge or otherwise.  That is a true statement, *see* Durham Decl. at ¶ 3, and

20  thus the objection is SUSTAINED.

21      Exhibit 32 is a series of emails between Anthony Gavin of Valero and Robert Gardner of

22  MPSI Systems.  Defendants object on the ground of lack of proper authentication, and for the reason

23  stated above, the Court agrees.  *See* Durham Decl. at ¶ 19.  The objection is SUSTAINED.

24      ii. Exhibits 31 and 33

25      Exhibit 31 is copies of pages of MPSI's Price Zones System User's Guide "produced by

26  MPSI in response to a subpoena which I issued and served in this action."  Durham Decl. at ¶ 18.

27

28      17

1    Exhibit 33 is a "copy of one page from Outlet Zone Assignments for Valero's stations in the San

2    Francisco Market in 2003 produced by MPSI in response to a subpoena which I issued and served in

3    this action." *Id*. at ¶ 20.  Defendants object that these documents are not properly authenticated,

4    because Durham "fails to testify as to the accuracy or genuineness of these documents based on

5    personal knowledge or otherwise."  It is arguable that Durham's statement that he issued and served

6    the subpoenas resulting in production of these documents is an attempt to lay a foundation of

7    personal knowledge, but the Court is inclined to agree with Defendants that it is insufficient.

8    Accordingly, the objection is SUSTAINED.

9                        iii.  Exhibits 9, 13A, 13B, 15, 16, 17, 19, 24, 34

10       Exhibit 9 is an excerpt from the deposition of Robert Barrantes.  Durham Decl. at ¶ 2.

11   Exhibits 13A and 13B are excerpts from the deposition of Dane Williams.  *Id*. at ¶ 4.  Exhibit 15 is

12   an excerpt from the deposition of Blair Skellie.  *Id*. at ¶ 5.  Exhibit 16 is an excerpt from the

13   deposition of Michael Olivares.  *Id*. at ¶ 6.  Exhibit 17 is an excerpt from the deposition of Craig

14   Speery.  *Id*. at ¶ 7.  Exhibit 19 is an excerpt from the deposition of Carolyn Scarola.  *Id*. at ¶ 9.

15   Exhibit 24 is an excerpt from the deposition of Sam Hirbod.  *Id*. at ¶ 12.  Exhibit 34 is an excerpt

16   from the deposition of David Goodrum.  *Id*. at ¶ 21.

17       Defendants object that these deposition excerpts are not properly authenticated, because they

18   do not include the reporter's certification that the deposition is a true record of the testimony of the

19   deponent.  *See Orr*, 285 F.3d at 773.  However, on December 12, 2006, Plaintiff filed a motion for

20   leave to file the reporter's certificates for these depositions, which the Court granted.  Thus, the

21   objection is OVERRULED.

22   **II.     Summary Judgment**

23   **1.     Valero Refining**

24       Defendants' first argument is that the Court should grant summary judgment as to Defendant

25   Valero Refining Company because it did not have a contractual relationship with PSI during the

26   relevant time period.  The contracts were assigned from Valero Refining to Valero Marketing

27

28                                                    18

1  Company in May 2002.  Skellie Decl. at ¶ 3.  The events here in dispute took place between

2  November 2003 and December 2004.  Accordingly, Valero Refining Company made no sales to PSI

3  during the relevant time, nor did it pay (or withdraw) Facilities Allowances to PSI.  Motion at 11-12,

4  Reply at 1.

5      Plaintiff does not contest this argument, nor does it offer evidence to the contrary.

6  Accordingly, the Court GRANTS summary judgment as to Valero Refining Company.

7  **2.      Breach of Contract**

8      The substance of Plaintiff's breach of contract claim is that Valero breached the agreements

9  by refusing to pay facilities allowances from November 2003 to December 2004.  Further, Plaintiff

10  asserts that Defendants breached the agreements "by unreasonably refusing to authorize its processor

11  to process Valero proprietary credit card transactions at PSI stations pursuant to an agreement

12  between PSI and the processor."  FAC at ¶ 22, 23.

13      Defendants argue that there is no genuine issue of material fact as to Plaintiff's breach of

14  contract claim – according to Defendants, it is undisputed that PSI ceased accepting Valero

15  proprietary cards and ceased using the credit card processing system specified by Valero Marketing

16  in November 2003.  This placed Plaintiff in breach of contract, and thus Defendants were permitted,

17  under the agreements, to suspend payment of the Facilities Allowance.  Further, Defendants contend

18  that the payment of Facilities Allowances by Valero was purely discretionary, and thus refusal to

19  pay was not a breach of contract.

20      Plaintiff asserts that Defendants' credit card authorization speeds were unreasonably slow,

21  which placed PSI at a competitive disadvantage.  Although Plaintiff concedes that Valero's card

22  processing system was a "facility requirement" under the Supply Agreement, and that the system

23  was specified by the Card Guide, Plaintiff contends that, under California Commercial Code § 2311,

24  Defendants' behavior was "commercially unreasonable."  Opposition at 6.

25      Section 2311(1) states, in relevant part, that "an agreement for sale which is otherwise

26  sufficiently definite . . . is not made invalid by the fact that it leaves particulars of performance to be

27

28                              19

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

specified by one of the parties.  Any such specification must be made in good faith and within limits set by commercial reasonableness."  Section 2311(3) provides that "where such specification would materially affect the other party's performance but is not seasonably made or where one party's co-operation is necessary to the agreed performance of the other but is not seasonably forthcoming, the other party . . . is excused for any resulting delay in his own performance."  Plaintiff argues that Defendants' insistence on using a slow credit card authorization system, and their failure to respond to dealers' concerns about the system, was commercially unreasonable and/or in bad faith.  Although they do not clearly say so, Plaintiff suggests that it was excused from performing its contractual obligations as a result.

Defendants argue that section 2311 is inapplicable here, because "[n]o special cooperation required by PSI was withheld by Valero."  Reply at 3.  This argument misses the mark: PSI is arguing that cooperation required by Valero – namely, their responsibility to specify a commercially reasonable credit card authorization system and respond to dealers' complaints – was unreasonably withheld.  However, it is doubtful that section 2311 does apply.  The agreement does not leave particulars of performance to be specified by one party: section 10.3.1 of the Supply Agreement states that the dealer agrees to comply with Attachment 1 – Image and Facility Requirements. Phelps Decl. Ex. R at PSI0000048.  In turn, Attachment 1 states that the dealer must use Valero's electronic card processing system. *Id*. at PSI0000062.   Further, section 5.2 of the Equipment Agreement requires the dealer to comply with the Credit Card Sales Guide. *Id*. at PSI0000077. Thus, the contracts are clear that PSI was required to use Valero's system, and although Valero reserved the right to change the Image and Facility Requirements and the Card Guide, there was no aspect of performance left unspecified.

Even if section 2311 does apply, the Court is unpersuaded that Valero's behavior fell outside the bounds of "commercial reasonableness."  Valero asserts that allowing retailers to make separate deals with credit card processors would threaten Valero's ability to provide a consistent retail experience to consumers, and that it would greatly increase Valero's costs.  *See* Skellie Decl. at ¶¶ 9-

United States District Court

For the Northern District of California

10. Plaintiff provides no argument, authority, or evidence to the contrary. Plaintiff makes no effort to define commercial reasonableness, instead offering the conclusory assertion that because the credit card authorization system was slower than that of other gas stations, Valero should have upgraded its system and failure to do so was commercially unreasonable.

In essence, PSI's argument is that Valero had a duty to use a better credit card processing system, and that their failure to do so gave PSI the right to use its own system. PSI cites absolutely no case law in support of this theory, nor does it cite to any provision of the agreements imposing such a duty on Valero. It is a specious argument, and the Court rejects it.

Although Plaintiff earlier appeared to concede that it did breach the dealer agreements, it next argues that it did _not_ breach the agreements by switching to another credit card authorization system, because the Card Guide in effect in July 2003 did not require dealers to only use Valero's network. Opposition at 8. Plaintiff cites to its Exhibit 12, which is a copy of the Card Guide in effect in July 2003. However, this exhibit has been excluded because it was not properly authenticated. Thus, Plaintiff has offered no admissible evidence proving that the earlier version of the Card Guide did not require them to use Valero's system. Further, it is undisputed that Valero sent dealers a letter in July 2003 warning them that failure to use the Valero system would be a breach of contract. It is also undisputed that Valero sent a letter on August 15, 2003, _before_ PSI completed its transition to a third-party credit card processor, alerting dealers to changes in the Card Guide.[4] The Card Guide in effect in September 2003 expressly stated that dealers were required to use Valero's system. Moreover, as discussed, Attachment 1 to the Supply Agreement (which was in effect all along) required PSI to use Valero's system.

---

[4]Plaintiff asserts that it has no record of receiving Valero's August 15 letter, and that "Defendants first provided a copy of the Sept 03 Card Guide revision to PSI by fax to its attorney on November 18, 2003." Opposition at 9. However, as noted, Shimek admitted in his deposition that although he personally never read the August 15 letter, the document was marked with a PSI production number, indicating that it came from PSI's files. Further, when asked whether he had any reason to doubt that the letter was received by Woodlands Valero (one of PSI's stations), Shimek answered in the negative. _See_ Phelps Decl. Ex. J (Shimek depo. at 164). Thus, there is no genuine issue of material fact as to whether Plaintiff received notice of changes to the Card Guide. The Court rejects Plaintiff's argument that PSI was not bound by changes in the Card Guide because it did not receive proper notice of them.

21

United States District Court

For the Northern District of California

1    PSI argues that Valero's revision of the Card Guide was not "seasonable," and thus it violated

2    California Commercial Code § 2311(3). Opposition at 9. However, as discussed above, that section

3    does not apply here; even if it did, the Court is completely unpersuaded by Plaintiff's argument –

4    essentially, Plaintiff argues that Valero waited too long to respond to dealers' complaints about the

5    credit card processing system, and by the time they made changes, PSI had already entered into an

6    agreement with another processor. Plaintiff appears to interpret California Commercial Code §2311

7    to mean that parties to a contract may do as they please so long as their actions are commercially

8    reasonable, and that the terms of a business relationship are not defined by the contract but by the

9    nebulous concepts of "reasonableness" and "seasonableness." This argument is untenable.

10    The contract itself does not specify any particular type or amount of notice that Valero must

11    give of changes to the Card Guide.[5] As Defendants point out, Section 5.2 of the Equipment

12    Agreement, which is the provision binding PSI to comply with the Card Guide, does not require any

13    notice at all – it merely states that the terms of the Card Guide may be amended and/or

14    supplemented at any time by Valero. Phelps Decl. Ex. R at PSI0000077. Accordingly, the Court

15    rejects Plaintiff's argument that it was either not aware of or not bound by the September 2003 Card

16    Guide. At the very least, Plaintiff admits that it was made aware of the changes to the Card Guide in

17    November 2003, very shortly after PSI ceased using Valero's credit card processing system.

18    Knowing that the Card Guide required them to use Valero's system, Plaintiff continued to use its

19    own system until December 2004. This fact also weighs against the credibility of the assertion that

20

21    _____

    [5]Plaintiff points to Section 10.3.2 of the Supply Agreement, which requires Valero to give notice
22    to the dealer of changes to Attachment 1. However, because it does not otherwise specify the method
    of notice, section 10.3.2 is arguably subject to section 23.1, which states that, "[e]xcept where
23    specifically required otherwise in this SUPPLY AGREEMENT, the following must occur to meet the
    requirement for due notice: (A) The party giving notice must post to the other party a properly addressed
24    written message by certified mail, with return receipt requested, and with adequate postage; (B) The
    party giving notice must send to the other party a properly addressed written message by a nationally
25    recognized overnight carrier; or (c) The party giving notice must have a written message personally
    delivered to the address of the other party." Phelps Decl. Ex. 6 at PSI0000057. An identical provision
26    is included in the Equipment Agreement. *Id*. at PSI0000084. There is no evidence that Valero did
    deliver the August 15 letter by certified mail, overnight carrier, or in person. However, as noted above,
27    Section 5.2 of the Equipment Agreement does not require any notice of changes to the card guide, and
    thus Section 23.1 does not apply to it.

28

1  PSI was proceeding in ignorance of the contractual requirements.

2      PSI next argues that Valero's refusal to allow them to process Valero proprietary cards on

3  their own system was "neither reasonable nor in good faith," once again citing California

4  Commercial Code § 2311(3).  Opposition at 11.  PSI argues that Valero's assertion that it would be

5  impractical to allow PSI to use a separate system to process Valero cards was incorrect, because

6  "VMSC was not required to change its business practices at any other location or to incur any costs

7  in order to allow PSI to process Valero cards.  VMSC refused to listen to PSI's consultant.  VMSC

8  was only required to authorize its processor to download information to PSI's gateway."  *Id*.  This

9  argument is not based on the law or the contract.  It is simply a reiteration of Plaintiff's complaint

10 that Valero was being unreasonable.  Be that as it may, it does not constitute a breach of contract.

11     PSI next argues that Valero did not have the discretion to stop paying Facilities Allowances,

12 pointing to Section 4.6.4 of the Supply Agreement, which states that, "[i]n addition to any rights of

13 VALERO contained in Section 4.6.3, VALERO will cease payment of the FACILITIES

14 ALLOWANCE if VALERO decides, in its sole discretion, that TENANT is not fulfilling all of its

15 responsibilities" under the agreements.  Phelps Decl. Ex. R at PSI0000042.  PSI correctly points out

16 that it is a dealer, not a tenant.  Opposition at 12.  However, PSI ignores the first part of Section

17 4.6.4, which refers to Valero's rights under Section 4.6.3.  That section states that "VALERO

18 reserves the right, in its sole discretion, to periodically change, reduce or eliminate, the FACILITIES

19 ALLOWANCE," with no reference to the tenant – in other words, section 4.6.3 clearly applies to

20 dealers.  In addition, section 4.6.1 states that Valero may "at its sole option" pay a Facilities

21 Allowance to the dealer, but that the dealer's obligations under the agreement are in no way

22 contingent on payment of the Facilities Allowance.  *Id*.  In other words, the contract is perfectly

23 clear that payment of Facilities Allowances was within Valero's discretion, and that Valero's failure

24 or refusal to pay Facilities Allowances did not permit a dealer to breach the agreements.

25     Plaintiff further argues that Valero could not refuse to pay Facilities Allowances because this

26 constituted "bad faith" behavior and price discrimination, relying on California Commercial Code §

27

28                                    23

2305(2).  Opposition at 12.  Section 2305(2) states that "A price to be fixed by the seller or by the buyer means a price for him to fix in good faith."  This statute applies to contracts in which the price term is left open, and it is intended to prevent suppliers from charging buyers with identical contracts different prices for arbitrary or discriminatory reasons.  Plaintiff argues that Valero refused to pay PSI Facilities Allowances for arbitrary and discriminatory reasons: "VMSC refused to allow PSI to process Valero cards for reasons that VMSC knew were invalid.  VMSC refused to listen to PSI's consultant.  VMSC charged PSI more for gasoline to force PSI to process all credit card transactions on Valero's network so that VMSC could collect processing fees from PSI's Visa and MasterCard transactions."  Opposition at 13.  This litany of complaints notwithstanding, Plaintiff is wholly incapable of rebutting the argument that the contract gave Valero the right to withhold Facilities Allowances, and that Valero did so because PSI refused to comply with a term of their agreement – namely, use of the Valero credit card processing system.  The Court is unpersuaded that there is even a triable issue of fact with respect to whether Valero engaged in bad faith behavior or price discrimination (as will be discussed further below).  On the contrary, it is undisputed that Valero warned PSI that Facilities Allowances would be withheld unless PSI used Valero's system, and gave PSI the opportunity to remedy the situation.  Plaintiff does not assert, much less offer any evidence, that there were other dealers who stopped using the Valero credit card processing system and were still paid Facilities allowances.  Thus, the Court rejects Plaintiff's argument that Valero was obligated to pay PSI Facilities Allowances.

Plaintiff next argues that the dealer agreements were unconscionable and should not be enforced by this Court.

Under California law, the doctrine of unconscionability has both a procedural and a substantive element, "the former focusing on oppression or surprise due to unequal bargaining power, the latter overly harsh or one-sided results."  *Discover Bank v. Superior Court*, 36 Cal. 4th 148, 160 (2005) (citations omitted).  Courts apply a sliding scale: "the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the

United States District Court

For the Northern District of California

conclusion that the term is unenforceable, and vice versa." *Armendariz v. Foundation Health Psychcare Services, Inc.*, 24 Cal. 4th 83, 114 (2000). However, Plaintiff must show that the dealer agreements were <u>both</u> procedurally and substantively unconscionable. *See Wayne v. Staples, Inc.*, 135 Cal. App. 4th 466, 480 (2006).

Plaintiff asserts that the agreements were "oppressive" (and thus procedurally unconscionable) because there was an inequality of bargaining power and they had no meaningful choice regarding its terms. *See Ting v. AT&T*, 319 F.3d 1126, 1148 (9th Cir. 2003). Valero gave PSI the choice to surrender possession of the four locations it had been running as Exxon stations, or to enter into franchise agreements. Opposition at 14-15. Further, PSI asserts, in order to purchase the land and improvements, PSI had to accept Valero's dealer agreements as written. *Id.* Plaintiff points to *A&M Produce Co. v. FMC Corp.*, 135 Cal. App. 3d 473, 489-90 (1986), in which the court commented that "[e]ven large business entities may have relatively little bargaining power, depending on the identity of the other contracting party and the commercial circumstances surrounding the agreement." Further, Plaintiff asserts that the agreements were procedurally unconscionable because they were "complex, pre-printed forms," and key provisions were not conspicuous and were not brought to PSI's attention. Opposition at 15. Thus, PSI claims, there was an element of unfair surprise.

Defendants argue that Plaintiff's procedural unconscionability argument fails because Shimek testified that he did not read the contracts before signing them, and relied on his attorney's advice to sign, therefore he cannot be heard to complain of unfair surprise. Defendants deny that they prevented PSI from understanding the agreements or that there was anything hidden from PSI. The Court agrees. Valero had no obligation to point out any particular provision of the contracts to PSI, particularly because PSI was represented by counsel and Shimek is an experienced, sophisticated businessman who chose not to even read the documents and to inform himself of their contents. *See A&M Produce*, 135 Cal. App. 3d 489 (noting that courts tend to be more reluctant to entertain procedural unconscionability claims by businesspeople with commercial understanding and

25

"more economic muscle than the ordinary consumer"); *American Software, Inc. v. Ali*, 46 Cal. App. 4th 1386, 1392 n.3 ("Some courts have considered the presence and advice of counsel to constitute circumstantial, if not conclusive, evidence that a contract is not unconscionable.").  It is true that the dealer agreements were standard forms drafted by Valero, and that PSI was apparently given no opportunity to negotiate the terms – that is, the agreements may be properly characterized as contracts of adhesion.  However, not all contracts of adhesion are unconscionable.  *See Morris v. Redwood Empire Bancorp.*, 128 Cal. App. 4th 1305, 1319-20 (2005) (recognizing that adhesiveness is not per se oppressive, and stating that "[o]ppression refers not only to an absence of power to negotiate the terms of a contract, but also to the absence of reasonable market alternatives").  PSI had the option of remaining a franchisee rather than becoming a dealer, or of walking away from the four stations at issue and seeking more favorable franchise or dealer agreements with another gas company.[6]  These may have been less desirable options, but they were still reasonable market alternatives.  Thus, the Court rejects Plaintiff's argument that the agreements were procedurally unconscionable.

Plaintiff also argues that the agreements were substantively unconscionable because they were unfairly one-sided.  The unfair terms identified by Plaintiff include: PSI could not buy gasoline from other suppliers, Valero had discretion to specify all credit card processing requirements, the agreements contained open price and quantity terms to be set by Defendants, and Defendants retained the unilateral right to terminate the agreements for a variety of reasons and to repurchase the stations without an appraisal.  Opposition at 16.  In contrast, PSI could only recover direct damages for breach of contract (no consequential damages), and "[n]o matter what defendants did, PSI could not terminate the agreements for 15 years." *Id*.

---

[6]Indeed, Plaintiff asserts that Defendants' dealer agreements were less fair than other dealer contracts in the Bay Area: "In 2001, most supply agreements between major refiners and dealers who owned their stations lasted no more than 10 years and contained provisions that allowed either party to terminate the agreements at will on 30 to 80 day written notice."  Opposition at 17.  Thus, Plaintiff was clearly aware that there were reasonable or preferable market alternatives, further weakening the procedural unconscionability argument.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    Defendants make several arguments in response. First, they point out that because PSI

2    operated Valero-branded stations, "it would be at best misbranding or fraud on the public if PSI

3    bought gasoline from 'other suppliers'" – thus, the contractual provision prohibiting PSI from buying

4    gasoline from other suppliers was not substantively unfair. Further, Defendants assert that the

5    contracts did not deprive PSI of the right to terminate based on common law grounds such as a

6    breach by Valero. Reply at 6. Finally, Defendants point out that open term provisions in

7    agreements are common and authorized by law. *See* California Commercial Code § 2305 (providing

8    that "[t]he parties if they so intend can conclude a contract for sale even though the price is not

9    settled").

10    The Court is inclined to agree with Defendants. The standard for invalidating a contract or a

11    portion thereof based on substantive unconscionability is stringent. *See American Software*, 46 Cal.

12    App. 4th at 1391 (holding that in order to find contract terms unconscionable, they must be so one-

13    sided as to "shock the conscience"). Although the business arrangement may well have been less

14    advantageous for PSI than for Valero, that does not render the contracts unconscionable.

15    Plaintiff protests that there are at least disputed questions of fact precluding summary

16    judgment on unconscionability. Unconscionability is a question of law for the Court to decide.

17    *Aron v. U-Haul Co. of California*, 143 Cal. App. 4th 796, 808 (2006). *But see McCollum v.*

18    *XCare.net, Inc.*, 212 F. Supp. 2d 1142, 1150 (N.D. Cal. 2002) (Wilken, J.) (noting that "disputed

19    questions of fact with respect to either the procedural or substantive aspects of the contract will

20    preclude a legal determination of unconscionability"). The Court is unpersuaded that Plaintiff has

21    met its burden, or that there are disputed material facts precluding a legal finding of

22    unconscionability. Accordingly, Plaintiff's unconscionability theory is rejected.[7]

23

24    _____

25    [7]Further, it is worth taking a step back and noting that PSI's aim in this lawsuit is to <u>enforce</u> the
contract: they assert that Valero breached by failing to pay Facilities Allowances, and seek damages for

26    that breach. Valero's defense is that its behavior was justified by PSI's own breach of contract, which
is why PSI is making the unconscionability argument in the first place. If this Court were to find that

27    the agreements are unconscionable and unenforceable, presumably PSI's breach of contract claim would
fail, and summary judgment on that claim would be appropriate.

28    27

United States District Court

For the Northern District of California

1    Because none of PSI's arguments as to why they were not contractually required to use

2    Valero's credit card authorization system are persuasive, there is no question that PSI was in breach

3    of contract during the damage period.  Valero had the contractual right to withhold the Facilities

4    Allowance (even absent a breach by PSI), and its decision to do so was not a breach of contract, nor

5    was it in bad faith.  Therefore, PSI's breach of contract claim must fail.  The Court GRANTS

6    summary judgment as to Plaintiff's breach of contract claim.

7    **3.      Unfair Competition – California Business & Professions Code § 17200**

8    Plaintiff claims that Defendants engaged in unfair competition by (1) refusing to pay

9    Facilities Allowances to Plaintiff during the damage period unless Plaintiff used Valero's credit card

10   processor and (2) by unreasonably refusing to authorize Plaintiff's processor to process transactions

11   using the Valero proprietary card.  FAC at ¶ 28.  Plaintiff claims that these actions were taken "with

12   an intent to penalize and thereby coerce plaintiff to use Valero's credit card processor in compliance

13   with Valero's Credit Card Sales Guide.  Valero Refining and/or Valero Marketing acted willfully

14   and with knowing disregard for its obligations to set a price for gasoline sold to plaintiff in good

15   faith and without discrimination and to enforce the supply and equipment agreements in good faith."

16   Plaintiff claims that Valero subjected it to cruel and unjust hardship and that Valero's conduct was

17   despicable.  *Id*. at ¶ 29.

18   California Business and Professions Code section 17200 prohibits unfair competition, which

19   is defined as "any unlawful, unfair or fraudulent business act or practice."  The California Supreme

20   Court has adopted the following test:

21       When a plaintiff who claims to have suffered injury from a direct
         competitor's 'unfair' act or practice invokes section 17200, the word
22       'unfair' in that section means conduct that threatens an incipient violation
         of an antitrust law, or violates the policy or spirit of one of those laws
23       because its effects are comparable to or the same as a violation of the law,
         or otherwise significantly threatens or harms competition.
24
     *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal. 4th 163, 186-87
25
     (1999).  The parties agree that *Cel-Tech* is not precisely on point, because PSI is not a direct
26
     competitor of Valero.  However, Defendants point out that California courts have applied the *Cel-*
27

28                                              28

United States District Court

For the Northern District of California

*Tech* test even in consumer cases, and Plaintiff appears to agree that it is the appropriate test, although Plaintiff would substitute the word "price discrimination" for "antitrust." *See* Opposition at 24.

Defendants contend that, "[i]n this ordinary commercial dispute, there is simply no basis for asserting that Valero Marketing's insistence that PSI comply with the parties' contracts as condition to receiving Facilities Allowances was improper or an 'unfair' business practice. Were the rule otherwise, commercial contracts would become meaningless in California." Motion at 17-18. They also point out that PSI offers no explanation of why Valero's refusal to authorize PSI's use of a different credit card system harmed competition.

Plaintiff makes the conclusory assertion that Valero engaged in price discrimination, that Valero "misrepresented the consequences of PSI's decision to process third party cards on a separate network," and that Valero "demanded that PSI pay higher processing fees on all transactions which, of course, led to higher retail prices to consumers." Opposition at 25. Plaintiff cites no legal authority in support of these statements, and devotes approximately one page to the section 17200 claim. Further, as will be discussed in the next section, Plaintiff's claim that Defendants engaged in price discrimination – which is the only possible theoretical underpinning for the section 17200 claim – lacks merit. Accordingly, the Court GRANTS summary judgment as to Plaintiff's section 17200 claim.

**4.      Price Discrimination – California Business & Professions Code § 21200; 15 U.S.C. § 13(a)**

California Business & Professions Code § 21200 provides that:

> It is unlawful for any refiner, distributor, manufacturer, or transporter of motor vehicle fuels or oils engaged in business in this state, either directly or indirectly, to discriminate in price between different purchasers of motor vehicle fuels or oils of like grade and quality, where the effect of such discrimination is to lessen competition, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them.

Similarly, the federal Robinson Patman Act, 15 U.S.C. § 13(a), provides that it is unlawful for any

29

United States District Court

For the Northern District of California

1  person engaged in commerce to directly or indirectly discriminate in price between different

2  purchasers of commodities of like grade and quality.  There are three jurisdictional requirements for

3  making out a claim under the Robinson Patman Act: (1) the alleged price discriminator must be

4  engaged in commerce, (2) the unlawful price discrimination must occur in the course of such

5  commerce, and (3) either or any of the purchases involved in such discrimination must be "in

6  commerce." *William Inglis & Sons Baking Co. v. ITT Continental Baking Co., Inc.*, 668 F.2d 1014,

7  1043 (9th Cir. 1981).  The Supreme Court has held that "merely showing adverse effects on

8  commerce will not satisfy the jurisdictional requirements of the Robinson Patman Act." *Id.* (citing

9  *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186 (1974)).  Rather, "[f]or a transaction to qualify, the

10 product at issue must physically cross a state boundary in either the sale to the favored buyer or the

11 sale to the buyer allegedly discriminated against." *Coastal Fuels of Puerto Rico, Inc. v. Caribbean*

12 *Petroleum Corp.*, 79 F.3d 182, 189 (1st Cir. 1996).

13    Defendants contend that this Court lacks jurisdiction over Plaintiff's Robinson Patman Act

14 claim.  Specifically, they contend that PSI has failed to meet its burden of showing that the

15 commodity at issue in the disputed transactions – gasoline – crossed a state line.  As evidence, they

16 offer Phelps Decl. Ex. X (Plaintiff's Response to Interrogatories at 20), in which Plaintiff was asked:

17 "Do YOU contend that Valero-branded gasoline YOU purchased for resale at the Valero-branded

18 service stations YOU operate was in interstate commerce?" and answered "No because PSI does not

19 know the origin of Valero-branded gasoline."

20    Plaintiff contends that the interstate commerce requirement of the Robinson Patman Act is

21 met because business was transacted across state lines – during the damage period, Valero initiated

22 electronic fund transfers from PSI's bank in San Francisco to Valero's bank in Texas.  Opposition at

23 20.  However, Plaintiff offers no authority contradicting Defendants' point that the actual product,

24 not money, must cross state lines in order to meet the jurisdictional requirements of the Act.  *See*

25 Reply at 9 (citing cases holding that the Act is only applicable to transactions involving tangible

26 goods, and noting that PSI cites no case holding that payment of money across state lines is

27

28                                                    30

United States District Court
For the Northern District of California

1    sufficient to invoke the Act).  Accordingly, Plaintiff's Robinson Patman Act claim is DISMISSED

2    for lack of jurisdiction.

3           Further, Defendants contend that PSI cannot establish jurisdiction under Business &

4    Professions Code § 21200 because that statute only applies to refiners of petroleum products whose

5    total production, capacity or sales volume at the wholesale level is 50,000 barrels a day or more.

6    Bus. & Prof. Code § 21201.  According to Defendants, Plaintiff has offered no evidence that

7    Defendants meet this standard.

8           Plaintiff responds that Valero "reported to the California State Board of Equalization taxable

9    distribution of motor vehicle fuels in excess of 117 million gallons (i.e. 90,000 barrels per day) in

10   December 2003 and 1.6 billion gallons (i.e. 110,000 barrels per day) in 2004.  *See* Plaintiff's Ex. 26,

11   27.  The source for Exhibit 26, which is simply a table of taxable gallons sold by Valero Marketing

12   and Supply Company, is the State Board of Equalization – Motor Vehicle Fuel Distributions

13   Reports.  This is not an exhibit to which Defendants objected, and the Court must view the evidence

14   in the light most favorable to the non-moving party (Plaintiff).  Defendants offer no response to

15   Plaintiff's argument in their reply.  Thus, the Court finds that Plaintiff has met the jurisdictional

16   requirements of California Business and Professions Code § 21201, or at least that summary

17   judgment should not be granted on that question.

18          Defendants contend that, even if Plaintiff can establish jurisdiction, the price discrimination

19   claims must fail.  The basis of the claims is that Valero paid Facilities Allowances to other dealers

20   and not to PSI.  Defendants point out that it was PSI's decision to forego receiving the Facilities

21   Allowance: "[p]ut another way, the allegedly lower, better prices were always equally available to

22   PSI.  This is fatal to PSI's price discrimination claim."  In support of this theory, Defendants cite

23   cases standing for the proposition that where a purchaser does not take advantage of a lower price

24   made available to other purchasers, "either no price discrimination has occurred, or the

25   discrimination is not the proximate cause of the injury."  *Shreve Equip., Inc. v. Clay Equip. Corp.*,

26   650 F.2d 101, 105 (6th Cir. 1981).  Although Defendants do not cite a Ninth Circuit case so holding,

27

28                                                   31

United States District Court

For the Northern District of California

this principle has been adopted by several Circuits.  *See Caribe BMW, Inc. v. Bayerische Motoren Werke Aktiengesellschaft*, 19 F.3d 745, 751 (1st Cir. 1994); *FLM Collision Parts, Inc. v. Ford Motor Co.*, 543 F.2d 1019, 1025-26 (2nd Cir. 1976).  Moreover, it is certainly a reasonable interpretation of the Robinson Patman Act, and of the concept of price discrimination generally.[8]  Plaintiff admits that it was made aware that it could receive the Facilities Allowance if it resumed use of the Valero credit card authorization system, but (without explanation) denies that it chose to forego Facilities Allowances.  Opposition at 22.  The lower price was available to Plaintiff, and it made a choice to forego it.  Thus, the Court rejects Plaintiff's price discrimination claims based on the "functional availability" doctrine.

Defendants further argue that Plaintiff's price discrimination claims must fail because PSI did not compete with allegedly favored dealers, which is a requirement for recovery under either the Robinson Patman Act or section 21200.  *See Stelwagon Mfg. Co. v. Tarmac Roofing Systems, Inc.*, 63 F.2d 1267, 1271 (3d Cir. 1995) (holding that to recover under Robinson Patman Act, disfavored purchaser must show that it was in actual competition with a favored purchaser at the time of the price differential); *Hamro v. Shell Oil Co.*, 674 F.2d 784, 790 (9th Cir. 1982) (holding that to survive summary judgment, plaintiff alleging section 21200 violation must show that it was in competition with the defendant's more favored customers).  Valero retained MPSI Systems, a market analyst, which used a computer model to predict which service stations compete with each other.  *See Spears Decl. at ¶ 4.  Based on MPSI's analysis and Price Zone Maps, *see* Phelps Decl. Exs. A-D, Valero contends that none of the four PSI Valero stations competes with another direct-supplied Valero station that received Facilities Allowances when PSI did not.  Motion at 22-23.  Plaintiff responds that the market for competition is determined by geographic area, and a determination of the proper

---

[8]Defendants admit that there are no cases applying the "functional availability" concept to California Business and Professions Code section 21200, but point out that "there are, however, also no cases rejecting the defense.  The economic and logical underpinnings of the Robinson Patman functional availability defense are equally applicable" to the section 21200 claim.  "[I]f the lower price is rejected *by the purchaser* then analytically, there has been no price discrimination *by the seller*."  Motion at 21-22.  The Court agrees.

32

United States District Court

For the Northern District of California

1    geographic market must be based on the "commercial realities of the industry," citing *State of*

2    *California v. Sutter Health System*, 130 F. Supp. 2d 1109, 1120 (N.D. Cal. 2001) (Chesney, J.),

3    which is a Clayton Act case (and thus not directly on point).  Plaintiff points to its expert, economist

4    Barry Ben-Zion, who opined that each of PSI's four stations competed with other Valero stations

5    during the damage period.  Thus, Plaintiff argues, there are genuine issues of material fact as to

6    whether PSI's stations competed with other Valero stations.  The Court is inclined to agree, although

7    Defendants correctly point out that Shimek testified that at least three of his stations are not in

8    competition with any direct-supplied Valero stations other than each other.  Phelps Decl. Ex. J

9    (Shimek Depo. at 220-22).  Defendants attempt to discredit Ben-Zion's opinion: "mere physical

10   proximity is insufficient to show competition between service stations, particularly given the unique

11   geography of the Bay Area."  Reply at 12.  However, it is not the Court's function at this juncture to

12   resolve conflicts in the evidence regarding PSI's competitors.

13        This is ultimately a moot point, though, because even assuming Plaintiff is correct that PSI

14   stations competed with other Valero dealers and were charged a higher price, it is undisputed that

15   the only reason PSI was charged a higher price is that they were in breach of contract, and as an

16   inducement to comply with the dealer agreements, Valero stopped paying them Facilities

17   Allowances of three cents per gallon.  Plaintiff insists that Valero did not offer Facilities Allowances

18   to PSI on an equal basis with other dealers during the damage period.  Opposition at 22.  But again,

19   Plaintiff does not assert, or offer any evidence, that any other Valero dealer breached its contract –

20   by switching to a different credit card authorization system or otherwise – and still continued to

21   receive Facilities Allowances.

22        Plaintiff argues that "[p]rice discrimination does not become lawful because a supplier

23   claims that a disfavored buyer has breached a contract.  Once VMSC refused to pay Facilities

24   Allowances to PSI, Facilities Allowances were no longer functionally available to PSI on an equal

25   basis."  Opposition at 22 (citing *F.T.C. v. Morton Salt Co.*, 334 U.S. 37, 42-43 (1948); *Delong*

26   *Equip. Co. v. Washington Mills Abrasive Co.*, 887 F.2d 1499, 1516-17 (11th Cir. 1989)).  The Court

27

28                                                    33

United States District Court

For the Northern District of California

1  finds nothing in the first case supporting the proposition for which Plaintiff cites it; the second case

2  examined the "functional availability" theory recognized in *Shreve*, *supra*, and held that it was not

3  available where the plaintiff did not voluntarily forego its ability to access the lower price. Here,

4  Plaintiff is accurately characterized as having voluntarily forgone the lower price. In order to

5  receive the Facilities Allowance, all it had to do was switch back to Valero's system, as required by

6  the agreements. Thus, Plaintiff has not presented facts from which a reasonable jury could conclude

7  that Valero engaged in price discrimination.

8       For the foregoing reasons, the Court GRANTS summary judgment as to Plaintiff's price

9  discrimination claims.

10      Finally, the parties dispute whether Section 18.7 of the Supply Agreement, which is a waiver

11  of consequential damages, bars Plaintiff's damage claims. Plaintiff claims that the section is not

12  enforceable to the extent that it would exempt Valero from the remedial provisions of price

13  discrimination statutes. Opposition at 19. Defendants make arguments to the contrary, *see* Reply at

14  14-15, but the Court need not reach this question, because as discussed, Plaintiff's statutory price

15  discrimination claims must be rejected. Indeed, the Court need not determine whether any damage

16  remedies are barred by the agreements, because Plaintiff is not entitled to any damages.

**CONCLUSION**

18      IT IS HEREBY ORDERED THAT Defendants' Motion for Summary Judgment [Docket No.

19  56] is GRANTED. The clerk shall close the file and terminate any pending matters.

20      IT IS SO ORDERED.

Dated: 12/14/06

SAUNDRA BROWN ARMSTRONG
United States District Judge

34